STATE OF NORTH CAROLINA v. LEE ODIS ALFORD

No. 18

(Filed 6 November 1979)

1. Constitutional Law § 31— indigent defendant—appointment of investigator

An indigent defendant's constitutional and statutory right to a State appointed investigator arises only upon a showing by defendant that there is a reasonable likelihood that such an investigator would discover evidence which would materially assist defendant in the preparation of his defense; defendant in this case pointed to no evidence which, if properly developed by an in-

State v. Alford

vestigator, would tend to show that someone other than defendant committed the crime, and the court therefore properly refused to appoint a private investigator.

**2. Searches and Seizures § 15 — outbuilding not rented by defendant — standing to challenge search**

Defendant had no standing to object to the search of a storage building located behind a house which he rented where defendant did not own or rent the outbuilding; he did not ever seek permission from the landlady to use the building; he had notice that the building was being used to store property belonging to someone else; and defendant therefore could not reasonably have concluded that the outbuilding constituted part of the premises rented to him.

**3. Criminal Law § 83; Marriage § 5 — no common law marriage between defendant and witness — witness competent to testify**

Defendant failed to establish that the woman with whom he lived and who bore his child was his common law wife pursuant to the laws of Pennsylvania, despite the fact that they lived together from 1968 and held themselves out as husband and wife, since the woman testified unequivocally that she did not marry defendant because she was not divorced from another man; therefore, G.S. 8-57, providing that the spouse of a criminal defendant is neither competent nor compellable to give evidence against the other spouse, did not preclude the woman from testifying against defendant.

Justice BROCK did not participate in the consideration or decision of this case.

DEFENDANT appeals from judgment of *Canaday, J.,* October 1978 Criminal Session, HARNETT Superior Court.

Defendant was tried upon a bill of indictment charging him with second degree murder.

The State offered evidence tending to show that in November, 1977, defendant was living in Sanford, North Carolina, with Margaret Alford, whom he considered to be his "common law" wife, and three children. Two of the children were born to Margaret and James Johnson, whom she had married in South Carolina. One of the children was born to Margaret and defendant during the time they lived together.

On Thanksgiving Day 1977 defendant took Margaret and the three children to visit various relatives and friends. Defendant first drove to his mother's house in Robeson County and then to his father-in-law's house. From there they went to see a friend in Fayetteville. From Fayetteville they drove to Fuquay to visit Eula Mae McArthur, known to defendant and Margaret as "Shor-

ty." Both defendant and Margaret had at one time worked tobacco with Ms. McArthur and were friendly with her.

It was dark by the time they arrived at Ms. McArthur's house. Margaret knocked and it took awhile for Shorty to answer. Finally, she came out with a butcher knife in her hand. Apparently she had been drinking. She was cursing her boyfriend Robert Mitchell and said she needed to make a telephone call. She got into defendant's car and they drove to various places until they found a telephone. After she made her telephone call, defendant drove everyone back to her house. Defendant and Shorty stayed in the car and talked. Defendant told her that "he didn't want no two dollars he wanted something else instead." Shorty gave the keys to her house to Margaret and drove off with defendant, leaving Margaret and the children behind.

Many hours later defendant returned alone. He told Margaret he had done what he wanted to do with Shorty and then shot her in the face with his shotgun. He thought she was dead. He said he had pulled her blouse up, her pants down, then dragged her into the woods and covered her up. Defendant and Margaret put Shorty's stereo and television in the car and drove home. During the trip home defendant noticed blood on the car window and wiped it up with some wine Margaret was drinking.

On 5 December 1977 Ms. McArthur's body was found near Angier in the southwest corner of a big field. The body was lying in a drainage ditch and was covered with leaves. The body was unclothed except for a blouse, a bra, a pair of panties, and a pair of socks. The blouse was pulled up around the shoulders. The brassiere had been pulled up, exposing the breasts, and the panties had been pulled down to the knees. A single shotgun wound on the right side of the face was determined to be the cause of death. Some superficial shotgun pellet injuries were found on the right shoulder.

Three spent Revelation 12-gauge shotgun shells were found at the scene of the crime. A Savage 12-gauge shotgun was found in defendant's house. A box of unfired Revelation 12-gauge shotgun shells was found in a metal outbuilding directly behind defendant's house. An expert in firearm identification and ballistics testified that, in his opinion, the spent shotgun shells

found at the scene of the crime were fired from the 12-gauge shotgun found in defendant's house.

The daughter of deceased went to her mother's home on the Saturday morning after Thanksgiving. She found the house had been ransacked and noticed her mother's television and stereo were missing. The stereo and television were later found in defendant's home.

Two of the children testified they had heard defendant tell their mother that he had shot Ms. McArthur.

Defendant testified that after Shorty made her telephone call, she asked him to pick up her boyfriend, Robert Mitchell, and bring him back to her house. Defendant drove everyone back to Ms. McArthur's house, then set off alone to pick up Robert Mitchell. Defendant was unable to find Robert Mitchell's house, returned to Shorty's house and told her he was not going to spend all night looking for Robert Mitchell. Defendant put Margaret and the children in the car and set out for home. This was the last time defendant saw deceased. On the way home defendant had car trouble. Margaret told him she still had the keys to Shorty's house. Defendant drove back to Ms. McArthur's house and found no one there. He and Margaret entered the house but did not ransack it. However, they decided to take Shorty's stereo and television. They loaded the stereo and television in the car and then left, arriving home at about eleven that night.

The jury convicted defendant of murder in the second degree, and he was sentenced to life imprisonment.

*Rufus L. Edmisten, Attorney General, by Thomas B. Wood, Assistant Attorney General, for the State.*

*W. A. Johnson and Sandra L. Johnson, attorneys for defendant appellant.*

HUSKINS, Justice.

[1] Defendant, an indigent, assigns as error the refusal of the trial court to appoint a private investigator for the purpose of assisting him in his defense. Defendant contends such denial of his pretrial motion for appointment of an investigator deprived him of his constitutional right to effective assistance of counsel

and violated the provisions of G.S. 7A-450(b), which requires the State to provide an indigent defendant "with counsel and the other necessary expenses of representation."

We fully considered the questions presented by this assignment in *State v. Gray*, 292 N.C. 270, 233 S.E. 2d 905 (1977); *State v. Montgomery*, 291 N.C. 91, 229 S.E. 2d 572 (1976); and *State v. Tatum*, 291 N.C. 73, 229 S.E. 2d 562 (1976). These cases hold that an indigent defendant's constitutional and statutory right to a State appointed investigator arises only upon a showing by defendant that there is a reasonable likelihood that such an investigator would discover evidence which would materially assist defendant in the preparation of his defense. Moreover, these cases conclude "that the appointment of experts to assist an indigent in his defense depends really upon the facts and circumstances of each case and lies, finally, within the discretion of the trial judge." *State v. Gray*, supra.

In the instant case defendant points to no evidence which, if properly developed by an investigator, would tend to show that someone other than defendant committed the crime. Absent such a showing, the State is not required by law to finance a fishing expedition for defendant in the vain hope that "something" will turn up. *State v. Tatum*, supra. Moreover, we note that a crucial component of State's case against defendant consisted of ballistics evidence tending to show that shells recovered at the scene of the crime were fired from a shotgun belonging to defendant. Recognizing this, the able trial judge allowed defendant's motion for appointment of a ballistics expert to aid in the preparation of his defense.

No abuse of discretion on the part of the trial judge has been shown. Accordingly, defendant's first assignment of error is overruled.

Defendant next challenges the admission of a box of shotgun shells and all testimony pertaining thereto on the ground that the shells were obtained in violation of defendant's rights under the Fourth Amendment and Chapter 15A of the General Statutes.

Defendant's motion to suppress this evidence was originally granted by the trial court. The State appealed this decision prior to trial pursuant to G.S. 15A-979(c), and the Court of Appeals

reversed the trial court's ruling, 38 N.C. App. 236, 247 S.E. 2d 634, *cert. denied*, 295 N.C. 649 (1978). At the trial of this case defendant renewed his objections to the admission of the shotgun shells and now assigns as error the admission of this evidence in his appeal of right to this Court following imposition of a life sentence. See G.S. 7A-27(a) (Cum. Supp. 1977).

The evidence adduced on voir dire tends to show that on 21 December 1977, defendant knowingly and voluntarily signed a concededly valid consent to search form which authorized SBI Agent Stewart and Deputy Sheriff Gregory to search "a one story frame residence occupied by Lee Otis Alford and Margaret (Maggie) Alford located at 1200 South Third Street, Sanford, N.C. . . . for a 12 gauge shotgun, single barrel, brown stock, dark barrel which is approximately 36" to 40" long."

After obtaining the above consent, Agent Stewart and Deputy Gregory drove to the Alford residence. Before searching the house, the officers had Margaret sign a consent form identical to the one signed by defendant. The search commenced and Agent Stewart quickly found a 12-gauge shotgun in a closet where defendant said it would be found. No 12-gauge shotgun shells were found in the house.

After the shotgun had been recovered, Deputy Gregory proceeded to a metal outbuilding located directly behind the frame house occupied by defendant and Margaret. During this time Agent Stewart remained inside the house engaged in conversation with Margaret.

The metal outbuilding approached by Deputy Gregory had dimensions of 30 feet by 20 feet and was located some fifty feet behind the Alford residence. The building had a double front door which was fastened shut but was not padlocked. Upon entering the building, Deputy Gregory turned directly to the left and spotted a box containing "thin tube radiations used in heating." In the corner, directly behind this box, he discovered the box of shotgun shells, the admissibility of which is now in question.

Defendant contends the warrantless search of the metal outbuilding after recovery of the shotgun was constitutionally improper because it exceeded the scope of the consent to search granted to Agent Stewart and Deputy Gregory. The State con-

tends defendant had no legitimate interest in the metal out-building and therefore has no standing to object to the search of the premises.

[2] "The immunity to unreasonable searches and seizures is a privilege personal to those whose rights thereunder have been infringed. They alone may invoke it against illegal searches and seizures." *State v. Craddock*, 272 N.C. 160, 158 S.E. 2d 25 (1967). *Accord*, 3 W. LaFave, Search and Seizure, § 11.3 (1978). Thus, before proceeding to the legality of the instant search, we must first determine whether defendant had a sufficient privacy interest in the metal outbuilding so as to confer standing to object to a search of the structure.

An individual's standing to claim the protection of the Fourth Amendment depends upon whether the place invaded was an area in which such individual "had a reasonable expectation of freedom from governmental intrusion." *Mancusi v. DeForte*, 392 U.S. 364, 20 L.Ed. 2d 1154, 88 S.Ct. 2120 (1968). Thus, the lack of property rights in an invaded area is not necessarily determinative of whether an individual's Fourth Amendment rights have been infringed. *Mancusi v. DeForte*, supra; *Jones v. United States*, 362 U.S. 257, 4 L.Ed. 2d 697, 80 S.Ct. 725 (1960). Nonetheless, there are many instances in which the presence or absence of property rights in an invaded area are the best determinants of an individual's reasonable expectations of privacy. *See Brown v. United States*, 411 U.S. 223, 36 L.Ed. 2d 208, 93 S.Ct. 1565 (1973); *Alderman v. United States*, 394 U.S. 165, 22 L.Ed. 2d 176, 89 S.Ct. 961 (1969); *United States v. Hunt*, 505 F. 2d 931 (5th Cir. 1974), *cert. denied*, 421 U.S. 975 (1975); *State v. Eppley*, 282 N.C. 249, 192 S.E. 2d 441 (1972). This is especially true in the circumstances of this case, where an individual who was not present at the time the search was made objects to the search of an outbuilding located directly behind his rented home. Thus, it is generally held that "a lessee has no standing to question the search of a portion of the premises not leased to him." W. LaFave, supra, § 11.3, at 549; *Spirko v. Commonwealth*, 480 S.W. 2d 169 (Ky. 1972); *State v. Robertson*, 102 R.I. 623, 232 A. 2d 781 (1967), *cert. denied*, 390 U.S. 1036 (1968); *Commonwealth v. Boykin*, 246 Pa. Super. 154, 369 A. 2d 857 (1977).

Application of the above principles to the facts of this case leads us to conclude that defendant has no standing to object to

the search of the outbuilding. Ruby McSwain, defendant's landlady, testified that she owned a storage building behind the house she rented to defendant; that the building was used to store materials belonging to her late husband; that her son also used the building to store certain elements of a solar heating system; that she had not included the storage building in the rental agreement with defendant; that defendant had never sought permission to use the storage building for his own personal use. Mrs. McSwain's testimony was substantially corroborated by Deputy Gregory, who testified that inside the storage building "was a big quantity of insulation, thin tube radiation, pipes, pipe fitting, like it might have been a store building that some plumber had put old junk in."

The above evidence makes it clear that defendant did not have a reasonable expectation of privacy with respect to the metal outbuilding and therefore has no standing to object to the search conducted by Deputy Gregory. Defendant did not own or rent the outbuilding. Nor did he ever seek permission from Mrs. McSwain to use the building. Moreover, defendant had notice that the building was being used to store property belonging to someone else. Under these circumstances, defendant could not have reasonably concluded that the metal outbuilding constituted part of the premises rented to him. Defendant's second assignment of error is therefore overruled.

[3]  With certain exceptions not applicable here, G.S. 8-57 (Cum. Supp. 1977) provides that the spouse of a criminal defendant is neither competent nor compellable to give evidence against the other spouse. Defendant contends the trial court erred in denying his motion to suppress the testimony of Margaret Alford, who was allegedly his common law wife pursuant to the laws of Pennsylvania.

Common law marriages are invalid in North Carolina. *State v. Wilson*, 121 N.C. 650, 28 S.E. 416 (1897); 1 R. Lee, North Carolina Family Law, § 9 (4th ed. 1979); Lynch, Social Security Encounters Common-Law Marriages in North Carolina, 16 N.C. L. Rev. 255, 259 (1938). Hence, the husband-wife testimonial privilege granted in G.S. 8-57 may not be asserted by a criminal defendant to disqualify a witness alleged to be his spouse by virtue of a common law marriage contracted in North Carolina.

This State, however, will recognize as valid a common law marriage "if the acts alleged to have created it took place in a state in which such a marriage is valid." 1 R. Lee, supra, § 9; *Harris v. Harris*, 257 N.C. 416, 126 S.E. 2d 83 (1962). Pennsylvania recognizes common law marriages. *In re Manfredi's Estate*, 399 Pa. 285, 159 A. 2d 697 (1960); *In re McGrath's Estate*, 319 Pa. 309, 179 A. 599 (1935). Thus, if defendant establishes that he entered into a *valid* common law marriage in Pennsylvania with Margaret Alford, she would not be "competent or compellable" under G.S. 8-57 to give evidence against him.

In Pennsylvania "[a] common law marriage is established by words in the present tense, uttered with the view and for the purpose of establishing the relation of husband and wife." *In re Estate of Gower*, 445 Pa. 554, 284 A. 2d 742 (1971). *Accord, In re Stauffer's Estate*, 372 Pa. 537, 94 A. 2d 726 (1953); *In re Mc-Grath's Estate*, supra. It is well settled in Pennsylvania that if *more positive proof is not available*, a common law marriage may be established by sufficient " 'proof of reputation and cohabitation, declarations and conduct of the parties, and such other circumstances as usually accompany the marriage relation.' " *In re McGrath's Estate*, supra (citations omitted). However, great pains are taken in the Pennsylvania cases to emphasize that cohabitation and reputation in and of themselves do not create a marriage. *In re Manfredi's Estate*, supra, and cases there cited. Cohabitation and reputation are merely circumstances from which a marriage may be presumed and such presumption may always be rebutted and will *wholly disappear* in the face of positive proof that no marriage has in fact occurred. *In re McGrath's Estate, supra; In re Bisbing's Estate*, 266 Pa. 529, 109 A. 670 (1920); *Commonwealth ex rel. McDermott v. McDermott*, 236 Pa. Super. 541, 345 A. 2d 914 (1975). Accordingly, it has been repeatedly held in Pennsylvania that evidence of cohabitation and reputation is *valueless* where one of the parties to the alleged marriage establishes through his or her testimony that no valid contract of marriage was entered into. *In re Nikitka's Estate*, 346 Pa. 63, 29 A. 2d 521 (1943); *In re McDevitt's Estate*, 280 Pa. 50, 124 A. 294 (1924); *In re Bisbing's Estate, supra; Commonwealth v. Jones*, 224 Pa. Super. 352, 307 A. 2d 397 (1973); *Jamison v. Williams*, 164 Pa. Super. 344, 64 A. 2d 857 (1949).

At the voir dire held pursuant to defendant's motion to suppress the testimony of Margaret Alford, the following testimony was given by the woman defendant asserted was his common law wife:

"My name is Margaret Ann Alford. I have lived with Lee Odis Alford since 1968. Prior to 1968, I had lived with another man. His name was James L. Johnson. I was married to him. I don't know when we got married, but we went to Dillon, South Carolina. We had two children. I have not obtained a divorce from James Johnson. During the time that Lee and I lived together I told him of my marriage to James Johnson. I never married Lee because I did not have a divorce.

\*    \*    \*    \*

I did not marry Lee Alford because I hadn't got a divorce. While I was living with Lee Alford I did make him aware of the fact that I had been married to James Johnson. That was before we moved to Pennsylvania."

This testimony by one of the parties to the alleged marriage constitutes positive proof that defendant and Margaret never contracted a common law marriage during the time they were "living" together in Pennsylvania. *Compare, Commonwealth v. Jones, supra.* In the face of such positive proof negating marriage, the evidence that Margaret and defendant have cohabited since 1968 and have held themselves out as husband and wife since that time is utterly valueless. *In re Nikitka's Estate, supra.*

We note that at the voir dire defendant testified that wedding vows were exchanged privately between himself and Margaret *in North Carolina* shortly after they began living together. Such vows had no legal effect in this State, which doesn't recognize common law marriage, or in Pennsylvania, since the vows were made outside its boundaries. At most, the testimony that such wedding vows were exchanged in North Carolina constitutes only minimal circumstantial proof that while living together in Pennsylvania, defendant and Margaret established the relation of husband and wife. However, such circumstantial evidence, like the evidence of cohabitation and reputation, is rendered valueless in the face of Margaret's

positive assertion that she never married defendant during the time she "lived" with him in Pennsylvania.

In light of our conclusion that defendant did not contract a valid common law marriage with Margaret Alford in Pennsylvania, we need not consider the effect of Margaret's previous marriage to one James Johnson on the validity of her subsequent relationship with defendant. Nor need we discuss the presumption arising in favor of the validity of a second marriage when it appears that a person has contracted two successive marriages. *See generally, Chalmers v. Womack*, 269 N.C. 433, 152 S.E. 2d 505 (1967); *Kearney v. Thomas*, 225 N.C. 156, 33 S.E. 2d 871 (1945).

In summary, defendant has failed to establish that Margaret Alford was his common law wife pursuant to the laws of Pennsylvania. It follows therefore that G.S. 8-57 did not preclude Margaret from testifying against defendant. Accordingly, defendant's motion to suppress Margaret's testimony was properly denied by the trial court. Assignments of error three, four and five are overruled.

For the reasons stated the verdict and judgment must be upheld.

No error.

Justice BROCK did not participate in the consideration or decision of this case.