STATE OF NORTH CAROLINA v. GLENN DEVON McKINNEY

No. COA04-1653

(Filed 18 October 2005)

**Search and Seizure— motion to suppress evidence—unlawful entry—fruit of the poisonous tree**

> The trial court erred in a first-degree murder case by denying defendant's motion to suppress the evidence found during the search of the victim's residence at which defendant also resided, and defendant is entitled to a new trial, where the victim's brother removed a window air conditioner in order to enter the residence and allowed officers to enter, officers entered without a search warrant and discovered what appeared to be blood-stains, and officers then obtained a search warrant and discovered the victim's body in the residence, because: (1) defendant had an expectation of privacy in the residence and had standing to challenge the officers' initial warrantless entry into the residence; (2) exigent circumstances did not exist to justify the officers' warrantless entry into the residence; (3) the State waived claims that defendant had abandoned the residence and that the evidence would have been inevitably discovered by its failure to rely on those claims to defeat defendant's motion to suppress at trial; and (4) the officers' initial warrantless entry into the residence was unlawful and the subsequent search warrant was based upon "fruit of the poisonous tree."

Appeal by defendant from judgment entered 16 April 2004 by Judge L. Todd Burke in Guilford County Superior Court. Heard in the Court of Appeals 25 August 2005.

*Attorney General Roy Cooper, by Special Deputy Attorney General Edwin W. Welch, for the State.*

*Paul F. Herzog for defendant-appellant.*

TIMMONS-GOODSON, Judge.

Glenn Devon McKinney ("defendant") appeals his conviction for first-degree murder. For the reasons stated herein, we reverse.

The State's evidence presented at trial tends to show the following: On 17 May 2003, law enforcement officers from the Greensboro Police Department discovered the body of Jerry Louis Alston

("Alston") in the laundry room of his residence. Alston's body was inside a city-issued trash can, which had been covered with a towel and two candles. Beneath the candles and towel was a computer-generated note reading "Glenn Devon McKinney did this."

Greensboro Police Department Sergeant Jane Allen ("Sergeant Allen") was the first law enforcement officer to enter Alston's residence the day his body was discovered. Sergeant Allen had gone to Drexel Road in Greensboro, North Carolina, in an effort to investigate an "assault [that] was supposed[] to have taken place." Earlier that day, Greensboro Police Department Sergeant D.S. Morgan ("Sergeant Morgan") notified Sergeant Allen that "someone named Phoenix may have killed someone named Jerry somewhere on Drexel Road." Sergeant Morgan subsequently informed Sergeant Allen that an individual named Amy Millikan ("Millikan") "had said that her room-mate had told her that her roommate's friend had told her that her boyfriend named Phoenix had advised that he had killed or assaulted an individual named Jerry on Drexel Road." As Sergeant Allen was approaching Drexel Road, she was informed that Alston's residence was "the house that seemed to match the description that was being given" by an individual named Aja Snipes ("Snipes"), as well as neighbors.

When Sergeant Allen arrived at Alston's residence, she noticed that the residence "appeared to be secure[,]" that the curtains or blinds of the residence were drawn, and that there was a small dog tied to a short leash near the rear of the residence. Sergeant Allen did not force entry into the residence at that time, because "[a]t that point [she] needed more to go on" and "didn't know for sure that an assault had occurred in there." Shortly thereafter, Sergeant Morgan notified Sergeant Allen that defendant was reported to be driving Alston's vehicle. Sergeant Allen noticed that the vehicle was not in Alston's driveway, and she began to speak to Irma Alston ("Irma"), Alston's sister. Irma told Sergeant Allen that Alston lived at the residence. Alston's brother, Ricky Alston ("Ricky"), subsequently arrived at the residence. Ricky informed Sergeant Allen that "he, like his sister, had not heard from [Alston] for at least several days . . . ." Sergeant Allen thereafter contacted Alston's employer. Although Ricky was "extremely concerned about the well-being of his brother[,]" based upon the information that had been presented to her, Sergeant Allen did not believe it was necessary to enter the residence. Instead, she believed she should continue her investigation in order to determine whether forced entry was necessary.

Sergeant Allen then "left briefly" to use the restroom. When she returned, Ricky had removed an air conditioning unit from a window and entered the residence. After Ricky "allowed" Sergeant Allen and Sergeant Morgan to enter, the officers walked through the residence. In a bedroom of the residence, Sergeant Allen observed "what appeared to be some dark spots on the wall." Sergeant Allen believed the spots were "some sort of high velocity spatter[,]" and she "considered the possibility" that the spots might be blood and that "some sort of an assault . . . might have taken place within the room." She noticed more dark colored liquid stains on the television, bed, chair, and carpet. Sergeant Allen asked Ricky whether he had seen the spots before. Ricky replied that he had not, and that he believed "perhaps maybe it was paint or something." Sergeant Allen thereafter "decided that a search warrant would be needed to proceed any further inside the residence." Sergeant Allen instructed Ricky to leave the residence, and she directed those officers outside the residence to secure the residence while she obtained a search warrant.

After obtaining a search warrant, Sergeant Allen returned to Alston's residence with Greensboro Police Department Detective David Spagnola ("Detective Spagnola"). While crime scene technicians investigated the bedroom, Sergeant Allen and Detective Spagnola noticed a large, city-issued trash can in the laundry room of the residence. The officers believed it was unusual for the trash can to be inside, and Detective Spagnola attempted to lift it. After Detective Spagnola was unable to lift it, Sergeant Allen believed that there might be a victim inside the trash can. The officers thereafter asked the crime scene technicians to photograph the trash can and its contents. When the officers opened the trash can, they discovered Alston's body inside.

Greensboro Police Department Corporal Michael McIntosh ("Corporal McIntosh") was speaking with Snipes while Alston's residence was being searched. Corporal McIntosh had learned that Snipes was defendant's girlfriend, and that defendant was living with Alston at the residence. During their ensuing conversations, Snipes informed Corporal McIntosh that she had spoken with defendant earlier that week and that defendant had admitted killing Alston. Snipes also informed Corporal McIntosh that defendant called her to apologize for "g[etting] her involved in the situation" and to request that she wire him money in Florida. Corporal McIntosh thereafter asked Snipes to aid him in convincing defendant to turn himself over to the police.

Defendant subsequently turned himself over to the Greensboro Police Department and, on 21 July 2003, he was indicted for the first-degree murder of Alston. Defendant's trial began the week of 12 April 2004. Prior to trial, defendant filed a motion to suppress the evidence seized during the search of Alston's residence. Following a hearing on 8 April 2004, the trial court denied defendant's motion. At trial, defendant testified that he and Alston had been fighting the night of Alston's death, and that he killed Alston in self-defense. On 16 April 2004, the jury found defendant guilty of the first-degree murder of Alston. After finding that defendant had a prior felony record level III, the trial court sentenced defendant to life imprisonment without parole. Defendant appeals.

The dispositive issue on appeal is whether the trial court erred by denying defendant's motion to suppress the evidence found during the search of Alston's residence. Defendant argues that the police officers' initial entry into the residence was unlawful, and that the subsequent search warrant was based upon "fruit of the 'poisonous' tree." We agree.

We note initially that while defendant filed a pretrial motion to suppress the evidence seized during the search of Alston's residence, he failed to object at each instance during the trial when this evidence was presented. Although our legislature has recently amended the Rules of Evidence to provide that "[o]nce the [trial] court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal[,]" N.C. Gen. Stat. § 8C-1, Rule 103(a)(2) (2003), this Court has more recently held that this amendment was unconstitutional as it is inconsistent with N.C.R. App. P. 10(b)(1). *State v. Tutt,* 171 N.C. App. 518, 521, 615 S.E.2d 688, 692-93 (No. COA04-821) (Filed 19 July 2005). Nevertheless, recognizing that the amendment to Rule 103 went into effect before the instant case went to trial, and that therefore defense counsel was operating under an assumption of its constitutionality, in our discretion pursuant to N.C.R. App. P. 2, we have chosen to review defendant's argument.

Our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law."

*State v. Cooke,* 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). Although our case and statutory law encourages trial courts to be specific in their orders regarding suppression motions, *see, e.g., State v. Horner,* 310 N.C. 274, 279, 311 S.E.2d 281, 285 (1984) ("Findings and conclusions are required in order that there may be a meaningful appellate review of the decision.") and N.C. Gen. Stat. § 15A-977(f) (2003) (requiring the trial court to "set forth in the record [its] findings of fact and conclusions of law" regarding a suppression motion), our Supreme Court has previously stated that "[i]f there is no material conflict in the evidence on *voir dire*, it is not error to admit the challenged evidence without making specific findings of fact . . . . In that event, the necessary findings are implied from the admission of the challenged evidence." *State v. Vick,* 341 N.C. 569, 580, 461 S.E.2d 655, 661 (1995) (citations omitted).

In the instant case, the transcript of the suppression hearing reflects that, after eliciting testimony from Sergeant Allen, the State argued that defendant had no standing to object to the initial warrantless entry of Alston's residence, and, in the alternative, that there were sufficient exigent circumstances authorizing law enforcement officials to enter the residence. The trial court thereafter concluded that "in its discretion, [it would] deny the motion to suppress and deny the motion to throw out the search warrant and the evidence [which] relied upon information that was illegally obtained by law enforcement." The trial court offered no reasoning for its decision at that time. In an order filed 12 April 2004, the trial court made the following findings of fact:

1. Members of the Greensboro Police Department obtained information as to a possible homicide at the residence of 1917 Drexel Road.

2. Upon arriving at said address, the residence was secure, meaning locked.

3. Officers received other information that family members had not heard from the owner of the residence, [Alston].

4. That [Alston] was the possible victim in the residence.

5. A family member was contacted in order to gain entry.

6. The family member, [Ricky], arrived at 1917 Drexel Road, and did not have a key to the residence.

7. [Ricky] then went through a window of the residence. Once inside, [Ricky] invited members of the Greensboro Police Department inside.

8. Greensboro Police Department conducted a cursory search to see if anyone was in need of medical assistance.

9. Once inside the residence, officers observed a bedroom with possible blood stains and spatter throughout the room and walls.

10. At that point officers exited the residence to obtain a search warrant.

Based upon these findings of fact, the trial court ruled as follows:

1. [Defendant's] motion to suppress evidence illegally seized is denied.

2. [Defendant's] motion to suppress evidence obtained by virtue of a search without a warrant is denied.

As detailed above, in its order denying defendant's motion to suppress, the trial court merely summarized the evidence presented at *voir dire* and offered a blanket conclusion regarding the ultimate issue before it. Assuming *arguendo* that this was proper considering the circumstances, and even according that "great deference" given to the trial court in reaching its determination, *Cooke*, 306 N.C. at 134, 291 S.E.2d at 619, because we conclude that the trial court's conclusions were not legally correct, we reverse. *See State v. Fernandez*, 346 N.C. 1, 11, 484 S.E.2d 350, 357 (1997) (concluding that the trial court's determination "must be legally correct, reflecting a correct application of legal principles to the facts found.").

"[I]t is clear that 'capacity to claim the protection of the [Fourth] Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion.' " *State v. Boone*, 293 N.C. 702, 708, 239 S.E.2d 459, 463 (1977) (quoting *Mancusi v. DeForte*, 392 U.S. 364, 368, 20 L. Ed. 2d 1154, 1159 (1968)). "Thus, the lack of property rights in an invaded area is not necessarily determinative of whether an individual's Fourth Amendment rights have been infringed." *State v. Alford*, 298 N.C. 465, 471, 259 S.E.2d 242, 246 (1979) (citations omitted). Instead, to assert standing and successfully challenge the legality of a search, a defendant may demonstrate

that the search occurred in an area in which he had a reasonable expectation of privacy. *See id.*

In the instant case, defense counsel attached an affidavit to defendant's motion to suppress alleging that defendant was a "lawful resident[]" of Alston's home at the time it was searched. At the suppression hearing, Sergeant Allen admitted that when she and other law enforcement officers first arrived at Alston's residence, they "had information that [defendant] was a resident of" Alston's residence, and that either Millikan or Snipes "believed that he resided there." At trial, various witnesses described defendant as Alston's "roommate," including those law enforcement officers who entered Alston's residence and acted pursuant to similar information from informants. In light of the foregoing, we conclude that there is no issue regarding whether defendant had standing to object to the warrantless search of Alston's residence. Accordingly, to the extent that it relied upon defendant's standing in reaching its decision, we conclude that the trial court erred.

Under the general rule, prior to searching the residence of a private citizen, law enforcement officials are required to secure a warrant based upon probable cause. *See, e.g, State v. Woods*, 136 N.C. App. 386, 390, 524 S.E.2d 363, 365, *disc. review denied*, 351 N.C. 370, 543 S.E.2d 147 (2000). However, "where law enforcement officers are responding to an emergency and there is a 'compelling need for official action and no time to secure a warrant,' " exigent circumstances exist which allow the officers to enter a residence without a warrant. *Id.* at 390, 524 S.E.2d at 366 (citations omitted). Thus, "[w]here . . . officers believe that persons are on the premises in need of immediate aid, or where there is a need 'to protect or preserve life or avoid serious injury,' the Supreme Court has held that a warrantless search does not violate the Fourth Amendment." *Id.* at 390-91, 524 S.E.2d at 366 (citations omitted). In such situations, " '[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' " *Mincey v. Arizona*, 437 U.S. 385, 392, 57 L. Ed. 2d 290, 300 (1978) (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963)). However, where a defendant challenges the circumstances justifying a warrantless search, the burden is on the State to prove the existence of such exigent circumstances. *Woods*, 136 N.C. App. at 391, 524 S.E.2d at 366.

"Facts and circumstances sufficient to constitute 'exigent circumstances' in the context of [F]ourth [A]mendment searches vary widely and have been the subject of a significant number of cases."

*State v. Johnson*, 310 N.C. 581, 586, 313 S.E.2d 580, 583 (1984) (citations omitted). "Despite the numerous fact situations giving rise to the characterization of 'exigency,' it appears to be the essence of 'exigent circumstances' that there was 'the lack of time to obtain a warrant without thwarting the arrest or making it more dangerous. *Where time was adequate, failure to obtain a warrant should not be excused.*'" *Id.* (quoting Latzer, Enforcement Workshop: Police Entries to Arrest—*Payton v. New York*, 17 Crim. L. Bull. 156, 165 (1981)) (emphasis in original).

In the instant case, we are not convinced that the circumstances created an exigency requiring that law enforcement officials immediately enter Alston's residence. At the suppression hearing, Sergeant Allen agreed that the information she had obtained was "related to [her], maybe second or third hand," and it indicated only that "something had happened [at Alston's residence] several days before perhaps[.]" When asked whether she could "state to the Court that there was an emergency to go in there and help someone that had been dead two to three days," Officer Allen replied as follows:

> No, sir. However, we frequently—we police officers frequently get information from citizens who express concern over the welfare of a relative or a friend and we will respond to residences. When we get this information, when it's coming third hand or secondhand, we attempt to verify all the facts that we can, of course. And in doing so when Miss Snipes was spoken to, the officers, as they related to me, said that she had said something bad had happened, that he had possibly been killed. As an officer I can't conclude that [] I have a victim of an assault because someone has said secondhand that that person may have been killed if they were not actually a witness to the assault that that person was actually killed. Therefore, to me, there was still the possibility that there might be someone inside the residence in need of medical attention or some sort of assistance.

Sergeant Allen later testified that she also had received "information from [Alston's] relatives and his co-workers that he had not been seen since Thursday . . . . [and] that this was unusual for him not to show up for work." Nevertheless, as detailed above, Sergeant Allen testified at trial that the residence appeared to be secure upon her arrival, that the curtains or blinds of the residence were drawn, and that there were no cars in the driveway. She also testified that she "needed more to go on" and "didn't know for sure" whether an assault had occurred in Alston's residence or whether it was necessary for her to enter the

residence. We conclude that this evidence, when viewed in its entirety, does not establish an immediate need of entry into Alston's residence. Although law enforcement officers were notified of a possible homicide, other pertinent information indicated that if a homicide had occurred, it had occurred more than two days prior to the officers' arrival at Alston's residence. Sergeant Allen and the other officers noted that Alston's residence was secure upon their arrival. After he was allowed to remove an air conditioning unit from a window of the residence in order to enter it, Ricky informed the officers that there was no one inside. At trial, Ricky testified that he, his sisters, and wife all walked through the residence prior to inviting the officers in, and that no one had seen "any bodies" in the residence. There is no indication that, had the officers left the scene in order to obtain a warrant, defendant's arrest would have been thwarted or Alston would have survived. In light of the foregoing, we conclude that the State failed to establish any exigent circumstances authorizing the officers' warrantless entry into Alston's residence. Accordingly, to the extent that the trial court relied upon exigent circumstances in reaching its decision, we conclude that the trial court erred.

We note that in its brief, the State asserts various other reasons that the trial court could have relied upon in denying defendant's motion to suppress, including that defendant had abandoned the residence and that the evidence would have been discovered inevitably. However, in *Cooke,* our Supreme Court noted that "[i]t would clearly be unfair" for an appellate court to consider on appeal those contentions not originally argued at the trial level, and the Court refused to allow the State "a gratuitous second chance" to develop new theories on remand. 306 N.C. at 136-38, 291 S.E.2d at 621. In the instant case, as there is "no affirmative indication in the record that the State intended to, or tried to, rely upon" the alleged inevitable discovery of the evidence or defendant's abandonment of the residence to defeat the motion to suppress, in light of *Cooke,* we are compelled to conclude that the State has abandoned both arguments. *Id.* at 138, 291 S.E.2d at 621-22.

It is a fundamental principle of our legal system that an individual's Fourth Amendment rights should not be violated, regardless of what charge that individual faces. Thus, even in the most grisly of cases, an individual's right to be free from illegal search and seizure must be strictly upheld. Where a trial court fails to suppress unconstitutionally seized evidence, the defendant is entitled to a new trial

unless the State demonstrates that the error was harmless beyond a reasonable doubt. N.C. Gen. Stat. § 15A-1443(b) (2003). In the instant case, after reviewing the pertinent case law and the record of defendant's trial, we conclude that the warrantless entry of Alston's residence was impermissible under those theories advanced by the State. Because we are not persuaded that the State produced overwhelming evidence to support defendant's conviction notwithstanding that evidence thereafter seized, we reverse defendant's conviction and order a new trial.

Reversed; new trial.

Judges HUDSON and ELMORE concur.