# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 22, 2012 Session

## STATE OF TENNESSEE v. LAVON DOUGLAS ROBERTSON

**Appeal from the Circuit Court for Lawrence County**
**No. 27993     Jim T. Hamilton, Judge**

---

**No. M2011-00868-CCA-R3-CD - Filed January 7, 2013**

---

The Defendant, Lavon Douglas Robertson, was convicted by a jury of one count of promotion of methamphetamine manufacture, a Class D felony. See Tenn. Code Ann. § 39-17-433.  The Defendant was sentenced as a Range I, standard offender to four years of supervised probation.  In this appeal as of right, the Defendant contends (1) that the trial court erred by denying his motion to suppress the evidence seized during a search of a one-room "dwelling" used by the Defendant and (2) that the evidence was insufficient to sustain the Defendant's conviction.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JEFFERY S. BIVINS, J., joined.  JAMES CURWOOD WITT, JR., J., filed a separate concurring opinion.

Claudia S. Jack, District Public Defender; and Richard H. Dunavant, Assistant Public Defender, for the appellant, Lavon Douglas Robertson.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; T. Michel Bottoms, District Attorney General; and Christi Leigh Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

On April 15, 2009, investigators with the Lawrence County Sheriff's Department (LCSD) received information from "a confidential source" that the Defendant "had a meth lab down at his residence."  The building in question was located on property at the end of Grinnell Drive in Lawrence County.  The property was owned by the Defendant's aunt,

Ivanell Adkins. However, the Defendant's aunt did not live on the property. At the entrance of the property was a "trailer" and a dirt road[1] leading off into a wooded area. The Defendant's cousin, Kerry Adkins, lived in the trailer. The dirt road went through the woods and led to a pond. Approximately "an eighth to a quarter of a mile" from the entrance of the property there was a "pull-behind camper" on the right side of the road and "a single story" building on the left side of the road.

At the suppression hearing, the Defendant testified that the building was actually the back bedroom of a "trailer" the Defendant had previously demolished. The Defendant thought the bedroom "was a good building, so [he] pulled it down there to the lake." Three of the building's walls had vinyl siding, but the fourth wall "was open" and had some "paneling on the outside." In front of the building were several cinder blocks used as steps leading to a door. Detective Parker Hardy and Investigator Gary Mills of the LCSD testified that hanging next to the door was a license plate with the Defendant's nickname, Peanut. Inside the building, the Defendant had a wood stove and "a mattress setting [sic] up on [cinder] blocks." There was no electricity or running water in the building. The Defendant admitted that the building belonged to him and that he would stay there from time to time with his "aunt's permission."

Investigator Mills testified that on the day in question, he approached the door to the building and "noticed the door was cracked just a little bit." Investigator Mills knocked on the door and "the door swung open." From the open door, Investigator Mills saw "a meth lab set up across [a] table" near the front of the room. Investigator Mills testified that he shut the door and went to get a search warrant while Detective Hardy secured the premises. After Investigator Mills returned with a search warrant, he recovered the following items from the building: muriatic acid, eight lithium batteries, ammonia nitrate, twenty pseudoephedrine pills, cans of Coleman camp fuel, two propane bottles, a "Cold Pack," several "white bottles" that contained or had contained lye, several two-liter bottles, forty feet of tubing, two funnels, five "homemade fittings," fifty coffee filters, a roll of foil, sandwich bags, a "bottle of unknown liquid," three Mason jars, pliers, a bowl "with residue," a wooden spoon, and two rolls of tape.

At trial, Investigator Mills was qualified as an expert witness concerning the manufacture of methamphetamine. Investigator Mills admitted that many of the items seized

---

[1] It is unclear from the appellate record whether the dirt road was a private driveway or a public road. The Defendant testified that the dirt road was a private driveway and that he had placed a gate and a stop sign at its entrance. However, the Defendant's aunt testified that the dirt road had been part of Grinnell Drive, but that sometime before April 15, 2009, "they had named [the dirt road] something" else that she could not recall.

from the Defendant's building were items that would usually be found around the home. However, Investigator Mills testified that "all this stuff" would not normally be kept "all together" in one place. Investigator Mills opined that "with everything displayed like it [was] on this table[,] spread out, [] the only thing it was used for [was] to manufacture meth." Investigator Mills also believed that the unknown liquid and residue on the bowl were evidence "that shows you [methamphetamine] has [recently] been made." Investigator Mills explained that the "homemade fittings" were the two-liter bottle caps that had holes drilled into them and tubing running through the holes. Investigator Mills further explained that the "homemade fittings" were used in a method of manufacturing methamphetamine called "shake and bake" where all of the ingredients needed to manufacture methamphetamine would be placed in a two-liter bottle and the "homemade fittings" would be sealed onto the top of the bottle with tape. Investigator Mills also explained that "Cold Packs" were commonly used as a source of ammonia nitrate, a key ingredient in the manufacture of methamphetamine.

Investigator Mills testified that the items used in a "meth lab" are considered "hazardous material[s]." According to Investigator Mills, the LCSD contracted with a "HazMat team" to dispose of the items seized. Investigator Mills admitted that the unknown liquid and the residue from the bowl were not "tested at a lab." Investigator Mills opined that the liquid was likely Coleman fuel and that the residue was likely "powder residue" from where the pseudoephedrine pills were crushed during the methamphetamine manufacturing process. Det. Hardy testified that he found several "burn piles" outside the building containing the remnants of bottles and Coleman fuel cans. Investigator Mills testified that manufacturers of methamphetamine will usually burn the components of a "meth lab" when they are done.

At trial, the Defendant admitted that the building belonged to him and that he often went to the building "to drink beer," but he denied that it was his residence. The Defendant claimed that he split his time living at the home of either his friend, Lanny T. Berryhill, Sr., or his cousin, Linda McMahan. The Defendant testified that he was not present at the building on April 15, 2009. He was arrested later that day at Ms. McMahan's home. The Defendant claimed that he had been staying at Ms. McMahan's home for "four or five days" prior to his arrest. The Defendant testified that he never locked the door to his building. The Defendant also testified at the suppression hearing that "everybody" in his family was allowed to use the building.

The Defendant testified that there was a problem with trespassers on his aunt's property. The Defendant testified that he could tell other people had been in his building based upon "[j]ust different ways it look[ed], different things missing in there or tire tracks, garbage." The Defendant claimed that trespassers would leave "things" in his building. The

Defendant also claimed that in an attempt to prevent people from coming onto his aunt's property, he posted "no trespassing" signs on a stop sign at the entrance to the property and on various trees in the woods. However, Investigator Mills testified at the suppression hearing that he did not recall seeing any "no trespassing" signs on April 15, 2009. Additionally, the Defendant introduced a photograph of the stop sign at trial, and it did not have a "no trespassing" sign attached to it.

The Defendant denied that he was manufacturing methamphetamine at his building and testified that he was "surprised" when he was arrested on these charges. The Defendant's aunt, Mr. Berryhill, and Ms. McMahan all testified that the Defendant had a problem with alcohol abuse, but they did not believe that he was using or selling methamphetamine. The Defendant admitted that several of the items seized by the police belonged to him including the Coleman fuel, the aluminum foil, the sandwich bags, the funnels, the propane bottles, the Mason jars, the two-liter bottles, the pliers, the tubing, the rolls of tape, the bowl, and the wooden spoon. The Defendant denied that the muriatic acid, the "Cold Pack," the lithium batteries, the "homemade fittings," the pseudoephedrine pills, the coffee filters, the white bottles containing lye, and the ammonia nitrate belonged to him. The Defendant claimed that these items "[m]ust have been somebody else's." The Defendant had no explanation for why all of these items were found together on a table inside his building.

In addition to this evidence, Det. Hardy, Investigator Mills, and Investigator Robert Denton testified that they had all been on the Defendant's aunt's property several months prior to April 15, 2009. The officers were called to the property after the Defendant discovered a body floating in the pond. All three officers testified that the Defendant informed them that he lived on the property and that the Defendant had invited them to come back to the property to fish on the pond. Investigator Denton testified that he had gone to the property on a couple of occasions after the body was found to kayak and that the Defendant had personally told him that he "could come back and fish when [he] wanted to."

Based upon the foregoing evidence, the jury convicted the Defendant of one count of promotion of methamphetamine manufacture. The trial court sentenced the Defendant to four years on supervised probation.

## ANALYSIS

### I. Motion to Suppress

Prior to trial, the Defendant filed a motion to suppress all evidence discovered during the search of his building. The Defendant alleged that the search warrant was invalid

because the application for the warrant "contained information obtained from an unlawful [warrantless] search" of the building. The trial court held a suppression hearing at which the Defendant and Investigator Mills testified to the facts discussed above. At the hearing, the Defendant argued that because there was no "walkway" from Grinnell Drive to the Defendant's building, the police had no right to enter his aunt's property and travel down the dirt road to the building. On August 3, 2010, the trial court entered an order denying the Defendant's motion to suppress. The trial court concluded that Investigator Mills "was legally on the premises" and that his actions were in compliance with the investigative practice commonly referred to as a "knock and talk."

On appeal, the Defendant contends that the trial court erred by denying his motion to suppress the evidence discovered during the search of his building. The Defendant argues that the police officers could not go past the stop sign at the entrance of the property because there was a "no trespassing" sign attached to it. The Defendant complains that by going beyond that point on his aunt's property, the police officers "were moving beyond an area impliedly open to the general public" and "became trespassers." The Defendant concludes that the officers could not attempt a "knock and talk" at the Defendant's building due to the "no trespassing" signs posted on his aunt's property and because there was no "pathway from a public road to the front door." The Defendant further argues that the "open fields" doctrine does not apply to this case because there were "no trespassing" signs posted on the property. The State responds that the police officers could enter onto the Defendant's aunt's property despite the "no trespassing" signs due to the Defendant's "personal invitation to the investigators to return if they so desired." The State further responds that "a posted no trespassing sign could not provide constitutional protection where otherwise none would exist in an open field" and that the police officers could enter onto the Defendant's aunt's property because it was tantamount to an "open field."

We begin by noting that the Defendant has failed to include the transcript for the motion for new trial hearing in the appellate record. The appellant carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the bases of appeal. See Tenn. R. App. P. 24(b). If an incomplete record is presented to this court, the appellant risks waiving issues raised on appeal. However, the State has not argued waiver on appeal, and the appellate record contains the Defendant's motion for new trial, which includes the issues raised on appeal, and the trial court's order denying the motion for new trial. Accordingly, waiver notwithstanding, we will address the issues on their merits.

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley,

307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. However, "when the trial court does not set forth its findings of fact upon the record of the proceedings, the appellate court must decide where the preponderance of the evidence lies." State v. Bobby Killion, No. E2008-01350-CCA-R3-CD, 2009 WL 1748959, at *13 (Tenn. Crim. App. June 22, 2009) (citing Fields v. State, 40 S.W.3d 450, 457 n.5 (Tenn. 2001)), perm. app. denied, (Tenn. Oct. 26, 2009). Here, the trial court made only minimal findings of fact in its order dismissing the motion to suppress. Additionally, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Meeks, 262 S.W.3d at 722.

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." Talley, 307 S.W.3d at 729 (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7). As has often been repeated, "the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment–subject to only a few specifically established and well delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see also State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007). Such exceptions to the warrant requirement include "searches incident to arrest, plain view, exigent circumstances, and others, such as the consent to search." Talley, 307 S.W.3d at 729. These constitutional protections "are designed to safeguard the privacy and security of individuals against arbitrary invasions of government officials." Id. (quoting State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998)) (internal quotation marks omitted). However, these constitutional protections "are personal in nature, and they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." State v. Cothran, 115 S.W.3d 513, 520 (Tenn. Crim. App. 2003) (quoting State v. Ross, 49 S.W.3d 833, 840 (Tenn. 2001)). Therefore, "[i]n order to challenge the reasonableness of a search or seizure, the defendant must have a legitimate expectation of privcy in the place or thing to be searched." Id. at 520-21.

The Defendant's main contention on appeal is that the police officers had no right to enter upon his aunt's property in order to reach his building, located approximately a quarter

of a mile away from the entrance to the property.[2]  Following our review, we conclude that the Defendant did not have standing to challenge the police officers' entry onto his aunt's property.  In Allen v. State, 29 S.W.2d 247 (Tenn. 1930), our supreme court held that the "constitutional provision forbidding the government and its officers to invade private property inures to the protection of the person in possession . . . [and] does not extend to third persons."  At issue in Allen was the search of "inclosed pasture land" that resulted in the discovery of a whisky still.  Id.  The pasture land was owned by the defendants' mother.  Id.  The two defendants lived in the house with their mother, but the pasture "did not adjoin the dwelling"; therefore, it was not included in the curtilage of the home.  Id.  Our supreme court concluded that the defendants "could only claim [the] constitutional protection upon invasion of the house and the immediate premises occupied by them either under contract or license from their mother.  They could not invoke the rule and extend it to an inclosed field remote from the house in which they resided."  Id.; see also Jordan v. State, 728 So. 2d 1088, 1095-96 (Miss. 1998) (defendant who had been living at his mother's trailer did not have standing to challenge search of a "garbage dump" 100 feet from the trailer because it was not part of the crutilage of the trailer); State v. Alford, 259 S.E.2d 242, 245-47 (N.C. 1979) (defendant did not have standing to challenge search of a metal outbuilding located directly behind his rental home because the building was not included in the rental agreement).

Here, the Defendant sporadically occupied a building, on his aunt's property, located approximately a quarter of a mile from the entrance to the property.  Based upon Allen, the Defendant had standing to challenge only the police officers' search of the building that he occasionally stayed at and the area immediately surrounding it.  The Defendant did not have standing to challenge any search over portions of his aunt's property that the Defendant did not own or have any possessory interest in.  For example, the Defendant would not have had standing to challenge a search of the trailer that his cousin, Kerry Adkins, lived in.  Likewise, the Defendant lacked standing to challenge the police officers' entrance onto his aunt's property a quarter of a mile from his building.  Accordingly, as long as the police officers acted reasonably in walking to the door of the Defendant's building and knocking on the door, then the search warrant and subsequent search of the building were valid and not constitutionally suspect.

This court has previously recognized the validity of the "knock and talk" procedure.  Cothran, 115 S.W.3d at 522.  The procedure is considered to be a consensual encounter with the police and a means for police officers "to request consent to search a residence."  Id. at

---

[2]As previously stated, it is unclear from the record before us whether the dirt road was a private driveway or a public road.  Clearly, there would have been no violation of the federal and state constitutional protections against unreasonable searches and seizures had the police traveled down a public road to the Defendant's building.

521. In explaining the "knock and talk" procedure and the reasoning for it, this court has quoted with approval the following:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof-whether the questioner be a pollster, a salesman, or an officer of the law.

Id. (quoting United States v. Cormier, 220 F.3d 1103, 1109 (9th Cir. 2000)).

The Defendant's main contention with regards to whether the police officers executed a valid "knock and talk" is that there was no "pathway" from Grinnell Drive to the Defendant's building. Likewise, the Defendant argues that there was no "pathway" from the dirt road to the door of the building. However, the validity of an attempted "knock and talk" does not depend on the existence of a cobblestone pathway or a set of ornate stepping stones leading from the road directly to a defendant's front door. Nor is the procedure limited only to buildings that the police can reach by major public thoroughfares. Instead, the operative question is whether the defendant has an expectation of privacy in the area between the roadway and the defendant's front door. This principle applies regardless of whether the police are approaching a one-room shack off of a dirt road or a residence off of Old Hickory Boulevard.

Here, a dirt road led from the entrance of the Defendant's aunt's property to the Defendant's building. Pictures entered into evidence at the suppression hearing and at trial showed that the door of the building was only a few feet away from the dirt road. A path worn in the grass led from the road to the door. The Defendant had used cinder blocks as a set of steps to the door and had hung a license plate with his nickname, Peanut, next to the door. There was no fencing or any other barriers to prevent a person on the Defendant's aunt's property from approaching the Defendant's building. The Defendant testified at the suppression hearing that the nearest "no trespassing" sign was approximately halfway between the entrance of the property and his building. Furthermore, the Defendant testified that he left the building unlocked and that he allowed his "cousins" to use the building. Additionally, the Defendant had previously invited Det. Hardy and Investigators Mills and Denton to come onto his aunt's property whenever they liked to fish on the pond. Based upon the foregoing, we conclude that the Defendant had no expectation of privacy in the area between the dirt road and the door of his building. Therefore, the LCSD investigators properly executed a "knock and talk" at the Defendant's door and the search warrant and

subsequent search were constitutionally valid. Accordingly, we conclude that the trial court did not err by denying the Defendant's motion to suppress.

## *II. Sufficiency of the Evidence*

The Defendant contends that the evidence was insufficient to sustain his conviction for promotion of methamphetamine manufacture. Citing State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971), the Defendant argues that the State's case against him was based solely upon circumstantial evidence and that the State failed to present proof that excluded every other reasonable hypothesis save his guilt. The State responds that in State v. Dorantes, 331 S.W.3d 370 (Tenn. 2011), our supreme court overruled Crawford and held that circumstantial evidence should be treated the same as direct evidence when determining the legal sufficiency of the evidence. Based upon the new standard announced in Dorantes, the State responds that the evidence was sufficient to sustain the Defendant's convictions.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Our supreme court recently clarified that circumstantial evidence is as probative as direct evidence. Dorantes, 331 S.W.3d at 379-81. In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting Crawford, 470 S.W.2d at 612) (quotation marks omitted). Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances

that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . [and] [i]f the jury is convinced beyond a reasonable doubt, we can require no more." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

A person promotes methamphetamine manufacture by committing any of the following acts:

> (1) Sells, purchases, acquires, or delivers any chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine, knowing that it will be used to produce methamphetamine, or with reckless disregard of its intended use;

> (2) Purchases or possesses more than nine (9) grams of an immediate methamphetamine precursor with the intent to manufacture methamphetamine or deliver the precursor to another person whom they know intends to manufacture methamphetamine, or with reckless disregard of the person's intent; or

> (3) Permits a person to use any structure or real property that the defendant owns or has control of, knowing that the person intends to use the structure to manufacture methamphetamine, or with reckless disregard of the person's intent.

Tenn. Code Ann. § 39-17-433(a).

The Defendant argues that his explanation "that some of the allegedly inculpatory items were used by him for mundane, legal purposes and others apparently belonged to trespassers represented a reasonable hypothesis which is no way excludable by all the evidence in the case." However, the State correctly notes that the Defendant's arguments are based entirely on legal precedents explicitly overruled by our supreme court in Dorantes. The Defendant's assertion that because his conviction was based solely upon circumstantial evidence the State was required to rule out every reasonable hypothesis except that of guilt is simply no longer the law in Tennessee. Instead, circumstantial evidence alone is sufficient to sustain a conviction and is treated the same as direct evidence when weighing the sufficiency of the evidence. See Dorantes, 331 S.W.3d at 381. The Dorantes standard recognizes that the jury is in a better position than this court to weigh the evidence and decide between the competing plausible theories presented by the State and a defendant.

Accordingly, this court's duty on appeal is "not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." Sisk, 343 S.W.3d at 67.

Here, it was uncontested that the Defendant owned the building and that he frequently stayed at the building with his "aunt's permission." Investigator Mills testified that on a table inside the building were all of the components necessary for the manufacture of methamphetamine with the exception of lye, and the police recovered several "white bottles" that either contained lye or had recently contained lye. Investigator Mills explained that while all of the components for methamphetamine manufacture were items usually found around a home, they would not be kept in one place unless they were being used to manufacture methamphetamine. Investigator Mills also testified that he found "homemade fittings" which were necessary for the "shake and bake" method of manufacturing methamphetamine. Outside the building were several burn piles consistent with the fact that manufacturers of methamphetamine typically burn the components of a "meth lab" when they are done. The Defendant admitted ownership of several of the items seized by the police but denied ownership of several of the key components used in the manufacturing of methamphetamine. The Defendant claimed that these items were left in his building by unknown trespassers. However, the Defendant had no explanation for why all of the components needed for the manufacture of methamphetamine were found together on a table in his building.

It was the province of the jury to weigh the evidence, judge the credibility of the witnesses, resolve any conflicts in the testimony, and choose between the competing theories presented by the State and the Defendant. Based upon the foregoing evidence, the State established a reasonable inference that the Defendant acquired the components necessary for the manufacture of methamphetamine and possessed them in his building. The jury was free to accept this reasonable inference and reject the Defendant's plausible competing theory. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for promotion of methamphetamine manufacture.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-11-