IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-215

No. COA21-91

Filed 5 April 2022

Mecklenburg County, Nos. 17CRS243898, 17CRS243899, 17CRS243900, 19CRS028359

STATE OF NORTH CAROLINA

v.

RICHARD HENRY JORDAN, JR.

Appeal by Defendant from judgments entered 28 January 2020 by Judge Daniel A. Kuehnert in Mecklenburg County Superior Court. Heard in the Court of Appeals 3 November 2021.

*Patterson Harkavy LLP, by Christopher A. Brook, for Defendant-Appellant.*

*Attorney General Joshua H. Stein, by Assistant Attorney General Joseph L. Hyde, for the State-Appellee.*

COLLINS, Judge.

¶ 1 Defendant Richard Henry Jordan, Jr., appeals from judgments entered upon guilty verdicts of possession of a firearm by a felon, possession of drug paraphernalia, and trafficking in cocaine, and a plea of guilty to attaining habitual felon status. Defendant argues that the trial court erred by denying his motion to suppress evidence gathered by police officers following their warrantless entry into a private residence. We reverse the trial court's denial of Defendant's motion to

suppress and remand the matter for further proceedings.

## I. Background

On 21 November 2017, the Charlotte Mecklenburg Police Department received a report of a stolen Infiniti car. One of the car's co-owners told officers that he suspected his girlfriend had taken the car and gave the officers the location of a house where she might be found.

At around midnight, Officer Patrick White and Officer Williams[1] responded to the house in an unmarked police vehicle. The house contained a salon and a residence which were separated by sealed doors. White and Williams drove down a driveway on the right side of the house, passed a door, and reached a gravel parking lot in the rear. The officers saw at least four cars parked there, including the Infiniti which had been reported stolen. White and Williams positioned their car so they could watch the Infiniti.

Shortly after arriving, White observed a man who White would later identify as Marcel Thompson "come around from the side of the residence where the door was," walk "right up to the driver's side door of the" Infiniti, "and kind of square[] up on the door as if he was going to go inside of the vehicle." White observed Thompson look up at the patrol car, stand "there for a second and stare[] directly at [the patrol car], and then immediately turn[] away from the car and [begin] walking

---

[1] Officer Williams did not testify at the suppression hearing or at trial.

quickly back down towards the side of the residence." White radioed Officers Erik Tran-Thompson and Jonathan Brito, who were in a marked patrol car nearby, to move in and detain Thompson. White explained that he wanted to stop Thompson because he and Williams "believed that [Thompson] was taking possession of the stolen motor vehicle at that time."

¶ 5    White and Williams pulled their patrol car into the driveway and saw Thompson standing at the door of the residence, appearing to "knock[] on the door hastily." When Williams opened the door of the patrol car, White heard Thompson "say either, 'it's the police' or 'police, police,' as he knocked on the door." Tran-Thompson and Brito entered the driveway and activated the blue lights of their patrol car while Thompson was still outside the residence. Brito also saw Thompson seeking to enter the residence, and Tran-Thompson heard Thompson yell, "It's the police!"

¶ 6    Williams, followed by Brito, approached Thompson while White and Tran-Thompson went to the parking lot to check the Infiniti. Defendant opened the door of the residence from inside; Thompson stepped inside but left the door open. Brito testified that Williams was speaking with Thompson while Thompson was in the open doorway. According to Brito, Williams said, "We need to talk to you. Come out here" immediately prior to entering the residence. Williams stepped into the residence and after 30 to 45 seconds indicated to Brito that the officers had enough to "lock it down." According to Brito, this meant that Williams believed the officers

had probable cause to seek a search warrant. At that time, Brito saw Defendant "standing next to [a] safe[,] close the safe, lock it with a key, and put the key in his pocket."

¶ 7        Officer Scottie Carson and Officer Turner[2] arrived in the third patrol car on the scene. When Carson and Turner arrived, Williams was already inside the residence, "around the corner into the bedroom," and speaking with a woman; Tran-Thompson was at the doorway; and Brito was at the table. Carson saw the door to the residence was open and observed a table inside with a razor blade, white powdery residue, baggies, and a safe on top. Tran-Thompson later confirmed that these items were "visible from the doorway." Carson entered the residence "because [he] could see how many individuals that were not law enforcement officers [were] inside" and there was "what appeared to [him] to be narcotics and narcotics paraphernalia[.]" Upon entering the residence, Carson saw Thompson directly in front of the door, Defendant standing, and an older man seated.

¶ 8        Carson went further into the residence toward the bedroom and bathroom because his "immediate thought" upon entering "was to go into [the] back room and clear it." Carson testified that he saw a firearm at the head of the bed and the officers "decided that [they] were definitely going to have to lock everything down." Carson elaborated that "[t]o lock everything down" meant to "get consent from the

---

[2] Officer Turner did not testify at the suppression hearing or at trial.

homeowner," prohibit those present from leaving, and refrain from touching or moving anything.

¶ 9 Brito testified that the officers did not determine who leased the residence until after the officers had entered the residence and "everybody was aware that [the officers] were locking it down." Body-worn camera footage shows the officers asked who lived in the residence after at least two officers had already entered. Tran-Thompson, Carson, and Brito each testified that the older man, Mr. Deitz, either leased or owned the residence.[3]

¶ 10 Carson and Tran-Thompson testified that Deitz gave the officers consent to search the residence. Brito's body-worn camera footage, portions of which were played at the suppression hearing, shows that Deitz did not answer when Williams initially asked for consent to search the residence. Instead, Deitz asserted that anything the officers might find belonged to a woman who was in the residence. When Williams again asked for consent to search the residence, Deitz stated that he was not giving the officers permission to search. Williams responded, "Well, in that case, . . . we're just gonna put everybody in handcuffs real quick, none of y'all are under arrest, you're just detained. And we're just gonna go ahead and get a search warrant, okay." Only then did Deitz interject, "Oh, well, you can search it then.

---

[3] The record contains multiple spellings of the occupant's name. We use this spelling to maintain consistency. Additionally, because the record is unclear as to whether Deitz was the owner or lessee of the residence, we refer to him as the occupant of the residence.

You ain't got to handcuff nobody." On the witness stand, Carson explained that Deitz refused to give the officers consent to search the safe because it did not belong to him. The officers placed the four persons in the residence in handcuffs.

¶ 11 The officers asked Defendant whether he stayed or lived at the residence; Brito recalled that Defendant "pretty much said something to the line of, 'Well, I don't have anything to do with anything that's in here. I don't live here. This has nothing to do with me.'" Brito did not "see any clothing items or overnight bags that belonged" to Defendant but could not tell whether the other officers had "found clothing or suitcases that belonged" to Defendant.

¶ 12 Regarding the safe, Defendant told the officers that they "didn't have a warrant" and "didn't have a reason to search the safe." Defendant stated that the safe did not belong to him, though Brito saw Defendant lock the safe and put the key in his pocket, and Carson later saw Defendant remove the key from his pocket. Later that night, the woman suspected of stealing the car told the officers that the safe belonged to Defendant.

¶ 13 When the officers could not get consent to search the safe from the four persons in the residence, they applied for and received a warrant to search the residence, including the safe. Upon executing the warrant, the officers seized cocaine, a pistol, and currency from inside the safe, and baggies, syringes, a digital scale, and a razor blade from beside the safe. Defendant was taken into custody and subsequently indicted for trafficking cocaine, possession of a firearm by a felon,

possession of drug paraphernalia, and attaining habitual felon status.

¶ 14    Prior to trial, Defendant moved to suppress all evidence gathered by the officers on 22 November 2017 as a result of their entry into the residence. Following a hearing, the trial court denied Defendant's motion to suppress. Though the trial court directed the State to prepare a written order, the record reflects that the trial court never entered a written order denying Defendant's motion to suppress.

¶ 15    In announcing its ruling from the bench, the trial court stated as follows:[4]

> [I]n this particular case, you've got a car that was reported stolen. There was an idea of where the car may be. The police . . . drove behind the location of where the report indicated the car might be. There were four cars behind the building in question that looks like a residence but it was part residence, part commercial enterprise. They saw four cars. One of the cars met the description of the stolen car.
>
> While they were there, a short -- very short time, an individual came out to -- looked like they were going to get into the car. They had actually touched the car. And as the officer testified, it looked as if he was going to enter the car and then noticed police and even used -- said the word "police" as he came back to the door to the residential part of the structure, knocked on the door.
>
> When the other marked cars -- the first car that he saw was not marked. And the other cars that came up with a marked car with marked uniformed officers, he

---

[4] Given the nature of the trial court's announced ruling from the bench, and without having entered a written order in this case, it is somewhat difficult to discern between the trial court's thoughts generally regarding the evidence and the findings of fact and conclusions of law it intended to make.

entered the residence. The individual had a red hoodie and I think was Mr. Thompson, not the defendant. The door was left open. And Officer Williams approached the door, put his foot through the threshold, at least one foot, spoke to the individual. It was raining outside, asked the individual if he wanted to come outside to talk.

The officers felt like that there was at least a scintilla of evidence, some evidence that the Mr. Thompson had possessed the stolen automobile, however briefly. They at least wanted to detain Mr. Thompson and talk to him about his involvement with the stolen motor vehicle that he had just walked away from and actually kind of hurriedly ran or jogged away from when [he] saw the police officers.

The officer, because the indication was that the Mr. Thompson didn't want to go outside in the rain, the circumstances as described by the officers seemed to indicate that Mr. Thompson would rather have the officer come inside out of the rain to talk to him, which he did.

The other officers, for safety reasons, approached. And a very short time while they were talking . . . the other officer that came in, saw the -- testified that he saw what looked to be cocaine or crystal-and-powder type substance with a razor and baggies or something similar material that looked like somebody had been cutting drugs, I think it turned out to be heroin, which led to further discussion, a protective sweep.

At some point early on, the owner of the residence, an older gentleman who leased the residence or owned it, gave consent. There was no time -- early on -- but no time did the defendant indicate that he had any kind of expectation of privacy and interest in the property where he had -- didn't want the officers to go, needed to get a warrant, that sort of thing.

The officers acted reasonably with a protective . . . sweep. . . . They were not doing any of this as a pretext. This house had not been previously -- this location had

not been previously targeted. So there was no pretext indicated.

And, later, because there were -- after the obvious plain view drugs, looked to be drugs, were seen, a warrant or warrants were issued to -- with regard to . . . the safe that nobody claimed ownership of.

That's some of the evidence that was presented and as the Court recalls it . . . it's similar to United States versus Santana. Some connection similar there.

There is also an argument . . . that there's actually circumstances when the defendant was fleeing referring to State versus Rigara. . . . [B]ut more accurately, I think the officers had a reasonable justification to detain the Mr. Thompson and to have him stopped. He didn't stop. And there would have been a heightened concern of potential loss of evidence or something nefarious afoot. He was touching the stolen car and then escaped, was trying to make his escape or flight away from the police officer and into . . . the residence. And so there was certainly justification to detain and talk with the individual.

And being that the owner of the residence made no indication whatsoever that the officers could not come in out of the rain, especially with the door open. There was never a time that I noticed that the door was actually closed to the officers. There was no attempt to close it. And there is no other arguments that could be made from the State's case that the door was left open for their entry.

¶ 16        Defendant was tried before a jury, which returned guilty verdicts of trafficking of cocaine, possession of a firearm by a felon, and possession of drug paraphernalia. Defendant pled guilty to attaining habitual felon status. The trial court sentenced Defendant to consecutive terms of 124 to 161 and 101 to 134

months in prison.[5]  Defendant gave notice of appeal in open court.

## II.    Discussion

¶ 17    Defendant argues that the trial court erred by denying his motion to suppress.  Our review of a trial court's ruling on a motion to suppress is limited to "whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law."  *State v. Biber*, 365 N.C. 162, 167-68, 712 S.E.2d 874, 878 (2011) (citation omitted).  Unchallenged findings are deemed supported by competent evidence and are binding on appeal.  *Id.* at 168, 712 S.E.2d at 878.  We review conclusions of law de novo.  *Id.*

## A.  Challenged Findings of Fact

¶ 18    Defendant initially contends that portions of two of the trial court's findings of fact are unsupported by competent evidence.  First, Defendant challenges the finding that Defendant "didn't want the officers to go, needed to get a warrant, that sort of thing" to the extent that it "suggests [Defendant] did not object to the warrantless entry."  While this finding is unclear, it does not state that Defendant did not object to the warrantless entry.  Defendant's challenge to this finding is without merit.

¶ 19    Next, Defendant challenges the trial court's finding that "the indication was that . . . Mr. Thompson didn't want to go outside in the rain" and "the circumstances

---

[5] The trial court also sentenced Defendant to 30 to 48 months in prison for another drug possession conviction in No. 18 CRS 206212, which Defendant has separately appealed to this Court.

as described by the officers seemed to indicate that Mr. Thompson would rather have the officer come inside out of the rain to talk to him, which he did." Defendant contends that this finding is not supported by competent evidence to "the extent [it] suggests Mr. Thompson consented to the officers' warrantless entry." Again, while this finding is unclear, it does not state that Thompson invited the officers in or otherwise consented to the warrantless entry. Defendant's challenge to this finding is also without merit.

**B. Reasonable Expectation of Privacy**

¶ 20 Defendant argues that the trial court's findings of fact and conclusions of law do not support denial of the motion to suppress for lack of standing to challenge the search. The State argues, on the other hand, that the trial court did not err in denying Defendant's motion to suppress because Defendant failed to show a reasonable expectation of privacy in the residence, and therefore was not entitled to challenge the search.

¶ 21 "'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'" *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) (quoting *Alderman v. United States,* 394 U.S. 165, 174 (1969)). The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection . . . has a legitimate expectation of privacy in the invaded

place."[6] *Rakas v. Illinois,* 439 U.S. 128, 143 (1978) (citations omitted). A legitimate expectation of privacy requires "two components: (1) the person must have an actual expectation of privacy, and (2) the person's subjective expectation must be one that society deems to be reasonable." *State v. Wiley*, 355 N.C. 592, 602, 565 S.E.2d 22, 32 (2002) (citation omitted). The defendant has the burden of showing such an expectation of privacy. *State v. Mlo*, 335 N.C. 353, 377, 440 S.E.2d 98, 110 (1994); *State v. Barnes*, 158 N.C. App. 606, 612, 582 S.E.2d 313, 318 (2003).

¶ 22    It is "well established that a person need not always have a recognized common-law property interest in the place searched to be able to claim a reasonable expectation of privacy in it." *Byrd*, 138 S. Ct. at 1527 (citations omitted); *see also State v. Alford*, 298 N.C. 465, 471, 259 S.E.2d 242, 246 (1979) (same). A place need not be a person's home "for one to have a legitimate expectation of privacy there." *Minnesota v. Olson*, 495 U.S. 91, 96 (1990). An overnight guest has a reasonable expectation of privacy in a residence sufficient to claim the protection of the Fourth Amendment. *Id.* at 96-97. So too may certain social guests. *See, e.g.*, *United States v. Gray*, 491 F.3d 138, 153 (4th Cir. 2007) ("[W]e have recognized that persons other

---

[6] Courts often denote this inquiry as whether a defendant has "standing" to press a Fourth Amendment claim. "The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search[.]" *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018). However, the Supreme Court has explained that this analysis "is not distinct from the merits" of a Fourth Amendment Claim but "'is more properly subsumed under substantive Fourth Amendment doctrine.'" *Id.* (quoting *Rakas*, 439 U.S. at 139).

than overnight guests can have a legitimate expectation of privacy in the home of another," typically "in the context of social visitors with near-familial relationships"); *Bonner v. Anderson*, 81 F.3d 472, 475 (4th Cir. 1996) (frequent visitor with close relationship to homeowner, whose relative was raised in home, and who formerly lived nearby, had reasonable expectation of privacy in home). But a person's "legitimate presence on the premises of the place searched, standing alone, is not enough to accord a reasonable expectation of privacy"; this would be "too broad a gauge for measurement of Fourth Amendment rights." *Byrd*, 138 S. Ct. at 1527 (quotation marks and citations omitted).

¶ 23      The evidence presented at the suppression hearing does not support a finding that Defendant lacked a reasonable expectation of privacy in the residence searched. Defendant was one of four persons present in the residence late at night. Officer Tran-Thompson testified that Defendant opened the door from inside the residence when Thompson knocked, indicating that Defendant had some authority over who would be admitted to the residence. The evidence further suggests that Defendant owned the safe and had permission to keep it in the residence. Taken together, this evidence demonstrates that Defendant had more than a mere "legitimate presence on the premises of the place searched[.]" *Byrd*, 138 S. Ct. at 1527.

¶ 24      The State emphasizes that Defendant did not own or lease the residence, but this does not conclusively determine that Defendant lacked a reasonable

expectation of privacy in the premises. *Alford*, 298 N.C. at 471, 259 S.E.2d at 246. The State also argues that Defendant "disclaimed any possessory interest in the premises and in the safe in particular." It is well established that a "reasonable expectation of privacy in real property may be surrendered . . . if the property is permanently abandoned." *State v. McKinney*, 361 N.C. 53, 56, 637 S.E.2d 868, 871 (2006). But Defendant did not deny his connection with the residence and disclaim ownership of the safe until after the officers effected their warrantless entry into the residence and detained its occupants. "[W]hen an individual 'discards property as the product of some illegal police activity, he will not be held to have voluntarily abandoned the property or to have necessarily lost his reasonable expectation of privacy with respect to it[.]'" *State v. Holley*, 267 N.C. App. 333, 347, 833 S.E.2d 63, 75 (2019) (quoting *State v. Cromartie*, 55 N.C. App. 221, 225, 284 S.E.2d 728, 731 (1981)); *see also State v. Borders*, 236 N.C. App. 149, 165, 762 S.E.2d 490, 503 (2014) ("[P]roperty may not be abandoned if it is done as a direct result of a law enforcement officer's illegal search or seizure."); *United States v. Leshuk*, 65 F.3d 1105, 1111 (4th Cir. 1995) ("[A] person does not voluntarily abandon property when the abandonment results from police misconduct[.]"). Additionally, while Defendant denied ownership of the safe and asserted that he did not "have anything to do with anything" in the residence, Defendant nonetheless exercised the power to exclude others from the safe by locking it and putting the key in his pocket. *See State v. Casey*, 59 N.C. App. 99, 114, 296 S.E.2d 473, 482 (1982) (holding defendant did not

relinquish expectation of privacy in plastic bags, despite denying ownership of them, because he maintained the "right to exclude all others from the bags by virtue of his right of possession and control").

¶ 25   The record does not support a finding of fact that Defendant lacked a reasonable expectation of privacy in the residence.  Accordingly, Defendant may challenge the search of the residence.

## C. Warrantless Entry into the Residence

¶ 26   "Upon timely motion, evidence must be suppressed if . . . [i]ts exclusion is required by the Constitution of the United States or the Constitution of the State of North Carolina[.]"  N.C. Gen. Stat. § 15A-974(a)(1) (2020).  The exclusionary rule "provides that evidence derived from an unconstitutional search or seizure is generally inadmissible in a criminal prosecution of the individual subjected to the constitutional violation."  *McKinney*, 361 N.C. at 58, 637 S.E.2d at 872 (citations omitted).

¶ 27   The Fourth Amendment guards the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"  U.S. Const. amend. IV.  "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980) (quotation marks and citations omitted).  But "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions."

*Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). "[E]xceptions to the warrant requirement are few in number and carefully delineated." *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984) (quotation marks and citation omitted).

### 1. *Exigent Circumstances*

One "well-recognized exception" to the warrant requirement "applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (quotation marks, brackets, and citations omitted). The Supreme Court has identified several situations which may amount to exigent circumstances sufficient to justify a warrantless entry into a home, including the need "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury," *Brigham City*, 547 U.S. at 403 (citations omitted); the need to prevent the imminent destruction of evidence, *King*, 563 U.S. at 460; and the hot pursuit of a fleeing suspect, *Lange v. California*, 141 S. Ct. 2011, 2024 (2021); *United States v. Santana*, 427 U.S. 38, 42-43 (1976). Courts assess whether a warrantless entry was justified by exigent circumstances based on the totality of the circumstances. *Lange*, 141 S. Ct. at 2018; *Riley v. California*, 573 U.S. 373, 402 (2014). "Whether a now or never situation actually exists—whether an officer has no time to secure a warrant—depends upon facts on the ground." *Lange*, 141 S. Ct. at 2018 (quotation marks and citations omitted).

The State argues that exigent circumstances justifying the officers'

warrantless entry into the residence "existed in the potential destruction of evidence and Mr. Thompson's attempted flight." But, as Defendant argues, the trial court erred by concluding that only a reasonable suspicion to detain Thompson justified the warrantless entry into the residence in pursuit of Thompson. The trial court concluded that "there was certainly justification to detain and talk with" Thompson and the officers "had a reasonable justification to detain [Thompson] and to have him stopped." However, warrantless entry into a home in pursuit of a suspect is permissible only where the officers have probable cause. *See, e.g.*, *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (per curiam) ("[P]olice officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home."); *State v. Adams*, 250 N.C. App. 664, 670, 794 S.E.2d 357, 362 (2016) ("A warrantless arrest in the home may be reasonable where there is probable cause and exigent circumstances.").

¶ 30      "[P]robable cause is defined as those facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information which are sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *State v. Parisi*, 372 N.C. 639, 650, 831 S.E.2d 236, 244 (2019) (quotation marks and citation omitted). Whether probable cause existed depends on the totality of the circumstances. *Id.* Reasonable suspicion cannot be substituted for probable cause. *Alabama v. White*, 496 U.S. 325, 330 (1990); *State v. Johnson*, 378 N.C. 236, 2021-NCSC-85, ¶ 16.

¶ 31        Although the trial court did not conclude that the officers had probable cause to arrest Thompson, the State contends that the officers in fact had probable cause to arrest Thompson for felony possession of a stolen vehicle.  This argument is unavailing because neither the trial court's findings nor the underlying record support such a conclusion.  The trial court found only that Thompson "looked like [he was] going to get into" the stolen car, "was touching the stolen car,"[7] saw the patrol car, "and then escaped, was trying to make his escape or flight away from the police officer and into the residence."  The State presented no other evidence connecting Thompson to the car, nor any evidence suggesting that Thompson knew or had reason to believe the car was stolen.  *See* N.C. Gen. Stat. § 20-106 (2017) (recodified at N.C. Gen. Stat. § 14-71.2) (providing that any person "who has in his possession any vehicle which he knows or has reason to believe has been stolen or unlawfully taken, and who is not an officer of the law engaged at the time in the performance of his duty as such officer shall be punished as a Class H felon").

¶ 32        The State contends that the officers were faced with the potential destruction of evidence in "either the car keys or the drug paraphernalia officers observed through the door."  While the State presented evidence that the drug paraphernalia might be seen through the open front door, it did not present evidence that Williams was actually aware of its presence and concerned for its potential destruction in his

---

[7] Though Defendant does not challenge this finding on appeal, we note that there was no evidence that Thompson touched the stolen Infiniti.

brief time at the door prior to entering the residence. As to the car keys, the State has failed to offer a credible explanation of how this evidence would be readily destructible such that the officers' immediate entry was necessary. *See King*, 563 U.S. at 461 ("Destruction of evidence issues probably occur most frequently in drug cases because drugs may be easily destroyed by flushing them down a toilet or rinsing them down a drain."). The State contends that Thompson's ability to put the car keys down presented a risk of destroying the evidentiary link between Thompson's possession of the keys and the stolen Infiniti. The State suggested at argument that the officers' ability to enter the residence and conduct a search to prevent this from happening would be "beneficial" to a subsequent prosecution for possession of the stolen vehicle. The State's argument fails in part because in a prosecution for possession of a stolen vehicle, the State may proceed on a theory of constructive possession or recent possession, notwithstanding a lack of actual possession of a stolen vehicle or its keys. *See, e.g., State v. McNair*, 253 N.C. App. 178, 187, 799 S.E.2d 631, 639 (2017) ("Under the theory of constructive possession, a person may be charged with possession of an item . . . when he has both the power and intent to control its disposition or use, even though he does not have actual possession." (quoting *State v. Davis*, 325 N.C. 693, 697, 386 S.E.2d 187, 190 (1989)). More fundamentally, the State's theory of imminent destruction of evidence is not borne out by the facts of this case: Williams entered the residence just moments after arriving at the front door. Thompson had not slammed the door behind

himself, to the contrary, he had left the door open and was talking to Williams immediately before Williams entered.

¶ 33    The totality of the circumstances in the present case does not reveal exigent circumstances sufficient to justify the officers' warrantless entry into the private residence.

### 2. *Consent*

¶ 34    Another "of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citations omitted). The State acknowledges in its brief that the trial court did not find that Thompson consented to the officers' entry. Instead, the State argues that the trial court did not err in denying the motion to suppress because Deitz, the occupant of the residence, gave consent.

¶ 35    The record is clear, however, that the officers did not determine Deitz was the occupant of the residence, speak with him, or gain his consent to search the residence until after they had illegally entered the residence without a warrant. Accordingly, the subsequent consent to search can justify the denial of Defendant's motion to suppress only if the taint from the officers' initial warrantless entry had dissipated. Courts consider three factors in determining whether the taint from an illegal search has dissipated: (1) the time elapsed between the Fourth Amendment violation and the procurement of consent or confession; (2) the presence of

intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois,* 422 U.S. 590, 603-04 (1975).

¶ 36 Here, the officers entered a private residence, without a warrant or probable cause, within seconds of engaging Thompson at the door. Such "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed[.]" *United States v. United States Dist. Ct.*, 407 U.S. 297, 313 (1972). The record demonstrates that the officers secured Deitz's consent closely on the heels of their entry into residence and their decision to "lock it down," which Carson testified included prohibiting those present from leaving. According to Brito, Williams decided that the officers would lock down the residence just 30 to 45 seconds after entering. Carson testified that the officers placed the four individuals in handcuffs and informed them that they would be detained until the officers obtained a warrant. The record does not reflect any other intervening circumstances between the officers' entry into the residence and Deitz's acquiescence in the search which would attenuate the taint of the officers' illegal entry. Because the taint of the initial illegal entry had not dissipated, Deitz's consent to search cannot justify the officers' warrantless entry into and search of the residence.

### 3. *Search Pursuant to Warrant*

¶ 37 Lastly, the State argues that the trial court did not err in denying the motion to suppress because Defendant was charged based on items found in the safe, which

was searched pursuant to a warrant. The State contends that the search of the safe pursuant to the warrant was not tainted by any illegal police conduct because the officers saw the drugs and drug paraphernalia inside the residence in plain view while they were still outside the doorway.

¶ 38       If information in an affidavit of probable cause that was "used to obtain a search warrant was procured through an unconstitutional [search], the warrant and the search conducted under it were illegal and the evidence obtained from them was fruit of the poisonous tree." *McKinney*, 361 N.C. at 59, 637 S.E.2d at 872-73 (quotation marks, brackets, ellipsis, and citation omitted). Evidence seized pursuant to a search warrant will not be excluded, however, if the facts in the affidavit independent of those gathered due to the unlawful police conduct gave rise to probable cause. *Id.* at 59, 637 S.E.2d at 873. In such a case, the challenged evidence is not a fruit of the unlawful police conduct, but the product of an untainted independent source. *See Segura v. United States*, 468 U.S. 796, 814 (1984) (declining to exclude evidence seized pursuant to a search warrant where "[n]one of the information on which the warrant was secured was derived from or related in any way to" the allegedly unlawful initial entry into an apartment).

¶ 39       Here, Tran-Thompson averred that there was probable cause to believe that certain evidence of heroin possession and possession of drug paraphernalia would be found both in the residence and on the persons of Defendant and Deitz. Tran-Thompson recounted the following facts and circumstances in support of this

assertion: (1) Defendant locking the safe upon the officers' entry, (2) apparent drug paraphernalia on a table "in the main living area," (3) a metal tin on the bed containing a spoon with residue of white powder, (4) drugs and paraphernalia on Thompson's person, (5) a handgun behind the bed, and (6) syringes in a linen closet. Each of these observations was the fruit of the officers' unlawful warrantless entry into the residence. The trial court did not find—and the State did not present any evidence—that the officers made any of these observations prior to entering the residence. The State's evidence merely suggesting that it was possible to observe some drug paraphernalia through the open doorway, absent evidence that any of the officers indeed saw the items before entering, fails to demonstrate that this information was obtained independent of the officers' unlawful warrantless entry into the residence.

¶ 40        The remaining information in the affidavit untainted by the officers' warrantless entry concerned the report of the stolen car, the presence of the stolen car in the back parking lot, Thompson's approach to the stolen car, and Thompson's return to the residence. This information fails to establish probable cause to search the residence, Deitz, or Defendant for evidence of possession of heroin and drug paraphernalia.[8] *See State v. Frederick*, 259 N.C. App. 165, 170, 814 S.E.2d 855, 859

---

[8] The search warrant in the present case provided only for the seizure of certain evidence of possession of drugs and drug paraphernalia. Because "[t]he scope of a search is generally defined by its expressed object," *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)

("[A]n affidavit is sufficient to establish probable cause 'if it supplies reasonable cause to believe that the proposed search for evidence *probably* will reveal the presence upon the described premises of the items sought and that those items will aid in the apprehension or conviction of the offender.'" (quoting *State v. Arrington*, 311 N.C. 633, 636, 319 S.E.2d 254, 256 (1984))), *aff'd per curiam*, 371 N.C. 547, 819 S.E.2d 346 (2018).

Because the affidavit supporting the issuance of the search warrant, stripped of the facts obtained by the officers' unlawful entry into the residence, does not give rise to probable cause to search the residence for the evidence of drugs and drug paraphernalia described in the warrant, "the warrant and the search conducted under it were illegal and the evidence obtained from them was fruit of the poisonous tree." *McKinney*, 361 N.C. at 59, 637 S.E.2d at 872-73 (quotation marks and citations omitted).

### III. Conclusion

Defendant did not lack a reasonable expectation of privacy in the residence. Exigent circumstances did not justify the officers' warrantless entry into the residence, and the taint of the initial warrantless entry is not removed from either the occupant's after-the-fact consent to search the residence or the subsequent warrant to search the residence and the safe. The trial court therefore erred by

---

(citation omitted), we need not address whether the affidavit established probable cause to search the residence for evidence of any other offense.

denying Defendant's motion to suppress evidence obtained as a result of the officers'

entry into the residence.

REVERSED AND REMANDED.

Judges HAMPSON and CARPENTER concur.